**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| BANQ, INC., | Case No.: 2:22-cv-00773-APG-DJA |
| Plaintiff | **Order Granting in Part Defendants' Motion to Dismiss** |
| v. | |
| SCOTT PURCELL, *et al.*, | [ECF No. 117] |
| Defendants | |

Banq, Inc. sues Scott Purcell, George Georgiades, Kevin Lehtiniitty, and two entities—Fortress NFT Group, Inc. and Planet NFT, Inc.—for trade secret misappropriation and other claims arising from the individual defendants' departure from Banq. The complaint alleges that the individual defendants stole Banq's trade secrets and corporate assets and deposited them in Fortress and Planet, which Purcell and Georgiades created to store these assets. The defendants move to dismiss Banq's complaint for failure to state a claim. Banq opposes the motion.

For the reasons below, I dismiss portions of Banq's conversion, fraud, breach of fiduciary duty, and unjust enrichment claims. I also dismiss Banq's negligent spoliation of evidence claim. But I deny the defendants' motion in all other respects.

I.    **LEGAL STANDARD**

Federal Rule of Civil Procedure 12(b)(6) allows me to dismiss a complaint for failure to state a claim. In evaluating a Rule 12(b)(6) motion, I take all well-pleaded allegations of material fact as true and construe the allegations in a light most favorable to the non-moving party. *Kwan v. SanMedica Int'l*, 854 F.3d 1088, 1096 (9th Cir. 2017).

Federal Rule of Civil Procedure 8(a) requires a "short and plain statement of the claim showing that the pleader is entitled to relief." A complaint's factual allegations must establish a plausible, not merely conceivable, entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Conclusory allegations of law are insufficient to defeat a motion to dismiss. *Id.*

Federal Rule of Civil Procedure 9 imposes an elevated pleading standard for fraud claims. Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." The facts pleaded must provide the defendants "notice of the particular conduct" so that they can defend against the plaintiff's accusations "and not just deny that they have done anything wrong." *Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001) (simplified). These facts must include the "who, what, when, where, and how of the misconduct charged." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (simplified). So "[t]he plaintiff must set forth what is false or misleading about a statement, and why it is false." *In re GlenFed, Inc. Securities Litigation*, 42 F.3d 1541, 1548 (9th Cir. 1994) (en banc).

## II.    ANALYSIS

The defendants move to dismiss all eleven claims in Banq's complaint. They argue that Banq's claims for trade secret misappropriation (claims 1 and 2) fail because the complaint does not identify a trade secret with sufficient particularity. They contend that Banq's claims under federal and state computer crime laws (claims 3 and 4) fail because they merely repurpose the trade-secret claims and do not adequately allege a violation of those statutes. They argue that

Banq's state-law claims for conversion (claim 5), fraud (claim 6), breach of fiduciary duty (claim 8), and unjust enrichment (claim 11) are preempted by Nevada's trade secret statute. And they contend that these state-law claims also fail for independent reasons, as do Banq's claims for aiding and abetting breach of fiduciary duties (claim 9), interference with prospective economic advantage (claim 7), and negligent spoliation of evidence (claim 10).

### A.    *Trade Secret Misappropriation*

The defendants argue that the Nevada and federal trade secret misappropriation claims do not describe the alleged trade secrets with sufficient particularity and do not plausibly allege that they have economic value. Banq responds that the complaint's description of the alleged trade secrets is sufficiently detailed, and that the complaint pleads facts showing that the secret information was economically valuable.

Under the federal Defend Trade Secrets Act (DTSA), a trade secret is broadly defined as "(1) information, (2) that is valuable because it is unknown to others, and (3) that the owner has attempted to keep secret." *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657 (9th Cir. 2020) (citing 18 U.S.C. §§ 1839(3), (5)). Because Nevada law has a "substantially similar" definition of a trade secret, *see* Nev. Rev. Stat. (NRS) § 600A.030(5), it is appropriate to analyze these claims together. *See InteliClear*, 978 F.3d at 657 (analyzing California trade secret claim together with the federal claim because the claims are substantially similar).

To succeed on a claim for misappropriation of a trade secret under the DTSA, a plaintiff must prove that it possessed a trade secret. *Id.* "To prove ownership of a trade secret, plaintiffs must identify the trade secrets and carry the burden of showing they exist." *Id.* at 658 (quotation omitted). So the plaintiff must "describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special

1  knowledge of those persons skilled in the trade." *Id.* (quoting *Imax Corp. v. Cinema Techs., Inc.*,

2  152 F.3d 1161, 1164 (9th Cir. 1998) (simplified)).  A plaintiff "may not simply rely upon

3  'catchall' phrases or identify categories of trade secrets they intend to pursue at trial." *Id.*

4      But at the pleading stage, a plaintiff need not "spell out the details of the trade secret."

5  *Autodesk, Inc. v. ZWCAD Software Co.*, No. 5:14-cv-01409-EJD, 2015 WL 2265479, at *5 (N.D.

6  Cal. May 13, 2015) (quotation omitted).  "Nor does a plaintiff need to plead trade secrets with

7  extensive detail beyond what is required to put the defendant on notice of the boundaries of the

8  trade secret." *Aristocrat Techs., Inc. v. Light & Wonder, Inc.*, No. 2:24-cv-00382-GMN-MDC,

9  2024 WL 3104806, at *4 (D. Nev. June 24, 2024).  Indeed, both *Imax* and *InteliClear* required a

10  particular description at the summary judgment stage, not at the pleading stage.

11      As the Ninth Circuit explained in *InteliClear*, issues involving "sufficient particularity

12  typically arise in the battleground of discovery," which "provides an iterative process where

13  requests between parties lead to a refined and sufficiently particularized trade secret

14  identification." *Id.* 978 F.3d at 662 (simplified).  Premature dismissal would short-circuit that

15  iterative process.  Additionally, requiring plaintiffs to describe the precise metes and bounds of

16  their trade secrets in their pleadings would effectively require plaintiffs to file their trade secret

17  misappropriation claims under seal, or else risk "public disclosure of the same trade secrets

18  [they] seek[] to protect." *Philips N. Am. LLC v. Advanced Imaging Servs., Inc.*, No. 2:21-CV-

19  00876-JAM-AC, 2021 WL 5054395, at *3 (E.D. Cal. Nov. 1, 2021).  Rule 8 does not require this

20  "heightened fact pleading of specifics." *Twombly*, 550 U.S. at 570.  For these reasons, "a

21  plaintiff should not be compelled to divulge with specificity all of its possible trade secrets . . . in

22  order to proceed to discovery." *T-Mobile USA, Inc. v. Huawei Device USA, Inc.*, 115 F. Supp. 3d

23  1184, 1193 (W.D. Wash. 2015).  Non-conclusory identification of the secret information that

1  plausibly separates it from matters of general knowledge suffices "for notice pleading purposes."

2  *Montgomery v. eTreppid Techs.*, LLC, No. 3-06-CV-00056-PMP-VPC, 2008 WL 11401776, at

3  *6 (D. Nev. July 2, 2008).

4        Banq's complaint alleges a "technology infrastructure for blockchain non-fungible tokens

5  ('NFTs'), such as a cross-chain, application programming interface-driven NFT 'wallet' that can

6  be embedded directly into an enterprise application, and other Web3 blockchain infrastructure

7  technologies." ECF No. 1 at 2.  The complaint also describes particular aspects of the NFT

8  wallet, not merely "broad categories of information" that are generally known. *Cf. AlterG v.*

9  *Boost Treadmills*, 388 F. Supp. 3d 1133, 1145-46 (N.D. Cal. 2019) (granting motion to dismiss

10  where complaint alleged "broad categories of information" like information about "anti-gravity

11  rehabilitation and training units" that was not "tethered to a specific technology" so the

12  defendants could determine what "aspects" of the technology was claimed).  In particular, the

13  complaint alleges that a "proprietary functionality" of the NFT wallet technology was a

14  "'linking' mechanism for exchanges." ECF No. 1 at 13.  And Banq developed this technology

15  after identifying "significant problems" that NFT wallets had to overcome involving "payment

16  processing, royalty management, [and] consumer engagement." *Id.* at 8.  It is reasonable to infer

17  from these allegations that Banq's NFT wallet embodies particular solutions to those issues.

18  These allegations provide the defendants a "roadmap to distill what information may be a trade

19  secret and what may not," not merely an "array of potential sources" left unspecified or a set of

20  "conclusory buzzwords" lifted from statutes.[1] *See Genasys Inc. v. Vector Acoustics, LLC*, 638 F.

21

22  [1] The defendants argue that the complaint here mirrors that in *National Specialty Pharmacy, LLC v. Padhye*, 734 F. Supp. 3d 922 (N.D. Cal. 2024).  In that case, the court dismissed a

23  misappropriation claim because the complaint only listed "catchall" categories of "*kinds* of trade secrets that might be at issue," such as "vendor and partner information, proprietary formulas, business processes, pricing strategies, pricing data, marketing methods, other data, computer and

1   Supp. 3d 1135, 1151-52 (S.D. Cal. 2022) (quotation omitted).  So Banq adequately identifies its

2   trade secret for notice pleading purposes.

3          That leaves the defendants' argument that Banq's complaint fails to allege independent

4   economic value.  The "standard to plead independent economic value is not high," and an

5   allegation that a "competitor could use the information to market itself more effectively"

6   suffices. *Wixen Music UK Ltd. v. Transparence Ent. Grp. Inc.*, No. 2:21-cv-02663-ODW

7   (MRWx), 2021 WL 6065690, at *8 (C.D. Cal. Dec. 22, 2021) (simplified).  Here, Banq allegedly

8   invested "millions of dollars" in developing its intellectual property portfolio. ECF No. 1 at 7-8.

9   According to the complaint, defendant Purcell suggested the NFT wallet technology offered

10  "almost everything this market needs, including both the mobile app and the API[s]" and

11  afforded Banq the potential for a "$968 billion market cap." *Id.* at 7.  So the complaint plausibly

12  alleges that Banq possessed information involving its NFT wallet that was economically valuable

13  because it was secret.

14         Therefore, Banq adequately pleads trade secret misappropriation.[2]  The defendants may

15  "pursue further definition of the trade secret at issue through discovery." *See Montgomery*, 2008

16  WL 11401776, at *6.  The "failure to specifically identify the trade secrets may be a problem

17  _____

18  software processes and systems." *Id.* at 929.  This list of categories is little more than a recitation
    of categories listed in the DTSA and the Restatement (First) of Torts. *See* 18 U.S.C. § 1839(3)

19  (defining "trade secret" to include "business [and] technical . . . information," "formulas," and
    "processes"); Restatement (First) of Torts § 757 cmt. b (1939) (defining "trade secret" to include

20  "information," "formula[s]," "process[es]," and "method[s] of . . . office management").  In
    contrast to the complaint's conclusory list in *National Specialty Pharmacy*, Banq's complaint

21  identifies the NFT wallet technology that allegedly qualifies for trade secret protection.

22  [2] Additionally, the defendants "have not provided any authority that Nevada employs a rule that
    would require dismissal on a motion for failure to state a claim for failure to adequately identify

23  the trade secret in the complaint." *See Montgomery*, 2008 WL 11401776, at *6.  So setting aside
    the DTSA claim, the defendants have not shown that I must dismiss the Nevada trade secret
    misappropriation claim.

later in the case," such as at the summary judgment stage. *Aristocrat Techs.*, 2024 WL 3104806,

at *5. But at this stage, I deny the defendants' motion to dismiss Banq's trade secret

misappropriation.

### B.    *Computer Crime Law Claims*

The defendants move to dismiss Banq's claims under the federal Computer Fraud and

Abuse Act (CFAA) (18 U.S.C. § 1030) and Nevada's Unlawful Acts Regarding Computers and

Information Services statute (NRS § 205.4765). They argue that Banq fails to meet Rule 9(b)'s

heightened pleading standard applicable to these claims, fails to allege that the defendants'

computer access was "without authorization," and fails to show that the defendants' computer

access caused "damage and loss."

The CFAA prohibits "intentionally access[ing] a protected computer without

authorization, and as a result of such conduct, caus[ing] damage and loss." 18 U.S.C.

§ 1030(a)(5)(C). The CFAA also prohibits "intentionally access[ing] a computer without

authorization or exceed[ing] authorized access, and thereby obtain[ing] . . . information from any

protected computer." 18 U.S.C. § 1030(a)(2)(C). The CFAA allows any victim who suffers

"damage or loss" to sue the perpetrator. 18 U.S.C. § 1030(g).

Nevada's computer crime law is similar. Under that law, a person who "knowingly,

willfully and without authorization" "[t]akes[,]" "[c]onceals[,]" or "[o]btains or attempts to

obtain access to, permits access to or causes to be accessed," "data, a program or any supporting

documents which exist inside or outside a computer, system or network is guilty of a

misdemeanor." NRS §§ 205.4765(1)(g), (h), (k). The statute also prohibits the same conduct

done to "equipment or supplies that are used or intended to be used in a computer, system or

network" or to a "computer, system or network." NRS §§ 205.4765(2)-(3). Similarly, the statute

1  prohibits "knowingly, willfully and without authorization . . . transfer[ing] or . . . us[ing] a device

2  used to access a computer, network or data." NRS § 205.4765(4). The statute allows any victim

3  of a misdemeanor under the statute to sue the perpetrator for "[d]amages for any response costs,

4  loss or injury suffered as a result of the crime." NRS § 205.511(1).

5             *1.     Applicability of Rule 9(b)*

6        The defendants argue that computer crime claims must be pleaded with particularity

7  under Rule 9(b) and that Banq has failed to do so. Banq responds that Rule 9(b) does not apply

8  to its computer crime claims because it sues under portions of the CFAA that do not contain

9  fraud as an element.

10        Even if fraud is not an essential element of a claim, the Rule 9(b) particularity

11  requirement applies to a "claim as a whole" if it is "grounded in fraud" or "sound[s] in fraud."

12  *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103-04 (9th Cir. 2003) (quotation omitted). A

13  claim is grounded in fraud if the plaintiff alleges a "unified course of fraudulent conduct and

14  rel[ies] entirely on that course of conduct as the basis of a claim." *Id.* at 1103. So Rule 9(b)

15  applies to CFAA or Nevada computer crime claims only if the complaint relies entirely on a

16  unified course of fraudulent conduct to allege those claims. *Compare NLRK, LLC v. Indoor Ag-*

17  *Con, LLC*, No. 3:21-cv-00073-LRH-WGC, 2022 WL 293252, at *7 (D. Nev. Jan. 31, 2022)

18  (holding Rule 9(b) did not apply to a CFAA claim under section 1030(a)(4), where the plaintiff

19  did not allege a unified course of fraudulent conduct and did not allege a "connection between

20  [its] fraudulent misrepresentation claim and the CFAA claim"), *with Banc of Cal., NA v.*

21  *McDonnell*, No. SA-CV-1801194-AGA-DSX, 2018 WL 8693922, at *4 (C.D. Cal. Nov. 9,

22  2018) (holding Rule 9(b) applied to a CFAA claim under sections 1030(a)(2) and (4) where

23

1  plaintiffs alleged a unified course of fraudulent conduct because they alleged "fraud as the basis
2  of the wrongdoing").

3      Here, neither section 1030(a)(2)(C) nor section 1030(a)(5)(C) contains fraud as an
4  essential element.  Nor does the complaint rely entirely on any fraud by the defendants to show
5  that the defendants accessed the computer systems without authorization.  The individual
6  defendants allegedly gained unauthorized access to Banq's computer systems by selling Banq's
7  computers to Fortress and Planet and by causing a third-party contractor, Softserve, to access
8  Banq's computer systems. ECF No. 1 at 10, 17.  The complaint alleges that the defendants
9  accessed the computer systems "with the intent to . . . defraud Banq of its computer data." *Id.* at
10  18.  The complaint also states that the sale of computers to Fortress and Planet "was nothing
11  more than a smokescreen to paper over the theft of Banq's confidential and proprietary
12  information." *Id.* at 10.  While these allegations reference deception, they do not indicate that
13  any misrepresentation to the board—the "smokescreen"—induced Banq to sell the computers to
14  Fortress or Planet.  Instead, the complaint suggests that the defendants' unauthorized sale and
15  subsequent access circumvented the board altogether. *Id.* (alleging that "Banq's Board was never
16  consulted (and would never have approved) this bargain basement 'sale' of Banq's corporate
17  property . . . .").  Banq's CFAA claim thus may entirely rely on showing that the defendants
18  converted Banq's computers, but conversion is not necessarily fraudulent.  Though Banq makes
19  fraud claims in its complaint, those claims are against Purcell alone and, as in *NLRK*, are
20  unrelated to the alleged conduct underlying Banq's CFAA claims against all individual
21  defendants.
22
23

9

1    Therefore, Banq's CFAA and Nevada computer law claims are not grounded in fraud.

2    Banq's CFAA claim must meet Rule 8's ordinary pleading requirements, not Rule 9(b)'s

3    heightened requirements.

4              2.    *"Without Authorization"*

5    The defendants argue that they purchased the computers from Banq, so any access to the

6    computers or the information on them was not "without authorization" as required by both

7    statutes.  Banq responds that the computer sale was a sham, so the defendants violated the

8    statutes by accessing the computers and the information without authorization after they finished

9    their employment at Banq.

10   To violate section 1030(a)(2)(C), a defendant must intentionally access a computer

11   "without authorization or exceed[ing] authorized access."  Similarly, to violate section

12   1030(a)(5)(C), a defendant must intentionally access a computer "without authorization."   The

13   "without authorization" clause "protects computers themselves by targeting so-called outside

14   hackers—those who access a computer without any permission at all." *Van Buren v. United*

15   *States*, 593 U.S. 374, 389 (2021) (simplified).  The "exceeds authorized access" clause "provides

16   complementary protection for certain information within computers . . . by targeting so-called

17   inside hackers—those who access a computer with permission, but then exceed the parameters of

18   authorized access by entering an area of the computer to which that authorization does not

19   extend." *Id.* at 389-90 (simplified).  Liability under the "without authorization" and "exceeds

20   authorized access" clauses is a "gates-up-or-down inquiry—one either can or cannot access a

21   computer system, and one either can or cannot access certain areas within the system." *Id.* at 390.

22   "An actor's authorization, or lack thereof, is assessed at the moment of access." *United States v.*

23   *Sullivan*, 131 F.4th 776, 785 (9th Cir. 2025).

For instance, in *LVRC Holdings LLC v. Brekka*, the defendant employee had permission to use the plaintiff employer's computer, and the employee accessed "information to which he was entitled by virtue of his employment with" the employer. 581 F.3d 1127, 1133, 1135 (9th Cir. 2009). While still employed, the employee emailed some of the employer's information to himself and his wife. *Id.* at 1133. The Ninth Circuit held that because the employee "had authorization to use the [employer's] computer, he did not access a computer 'without authorization.'" *Id.* at 1135. Consequently, he did not act "without authorization" when he "emailed [the employer's] documents from his work computer to himself and to his wife." *Id.* But if the employee had accessed the employer's information by logging into a company website "after he left the company," the employee "would have accessed a protected computer 'without authorization' for purposes of the CFAA." *Id.* at 1136; *see also Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1066 (9th Cir. 2016) ("[H]ad the employee [in *LVRC Holdings*] accessed company computers without express permission, he would have violated the CFAA.").

Banq alleges that the individual defendants violated sections 1030(a)(5)(C) and (a)(2)(C) "[a]fter their departure from Banq." ECF No. 1 at 17. As for section 1030(a)(5)(C), the individual defendants allegedly achieved post-employment access to these computer systems by selling Banq's physical computers to Fortress while the defendants were still Banq employees. *Id.* at 10. The sale granted the individual defendants (some of them owners of Fortress) access to those machines after they resigned from Banq. *Id.* at 9-10. And "those electronic devices contained electronic files comprising, and provided access to, Banq's corporate assets, trade secrets, intellectual property, and other proprietary technology." *Id.* at 10. The individual defendants also allegedly caused Softserve, a third-party contractor, to access Banq's computer information on their behalf in violation of section 1030(a)(5)(C). *Id.* at 17. As for section

1    1030(a)(2)(C), the defendant individuals allegedly accessed "confidential and proprietary

2    information from Banq's protected cloud-based server system." *Id.* at 18.

3        Taking the section 1030(a)(5)(C) claim first, Banq alleges that the individual defendants

4    accessed the sham-sold computers and the information physically stored on those computers

5    post-employment. The complaint alleges that the board "would never have approved" the

6    "bargain basement" sale to Fortress if they had known of it. *Id.* at 10. It is reasonable to infer,

7    based on this allegation, that the computer sale to Fortress required board authorization. Because

8    the Banq board did not approve the computer sale, the sale was plausibly unauthorized. Unlike

9    the employee in *LVRC* who was authorized to send the email containing company documents to

10   himself, the individual employees here plausibly lacked authorization to sell the computers to

11   themselves. This unauthorized sale taints the defendants' subsequent access of the computers.

12   *See NetApp v. Nimble Storage*, 41 F. Supp. 3d 816, 829-30 (N.D. Cal. 2014) (noting that scope

13   of authorized access "does not depend entirely on circumvention of a technological barrier").

14   Moreover, the defendants' post-employment access of Banq's information was allegedly entirely

15   unauthorized: the gates for access were up, not down. So the defendants' post-employment

16   access was not merely a violation of Banq's "corporate computer use restrictions." *See United*

17   *States v. Nosal*, 676 F.3d 854, 862 (9th Cir. 2012). The complaint thus plausibly alleges that the

18   defendants accessed the information on the computers sold to Fortress without authorization.

19       Turning to the section 1030(a)(2)(C) claim, Banq alleges that the individual defendants

20   accessed Banq's "protected cloud-based server system" without authorization post-employment.

21   ECF No. 1 at 18. A reasonable inference is that post-employment, the defendants did not have

22   authorization to access Banq's cloud-based servers. It is also reasonable to infer that the

23   defendants had useful information and equipment for accessing Banq's cloud-based servers, not

1    merely the information contained on the computer hard drives themselves.  The complaint thus

2    plausibly alleges that the defendants accessed information on the cloud-based servers.

3    Therefore, the complaint plausibly alleges that the defendants accessed Banq's computer systems

4    "without authorization" under sections 1030(a)(5)(C) and (a)(2)(C).

5             3.        "Loss" or "Damage"

6            The defendants argue that Banq has not alleged that the defendants' conduct caused any

7    loss or damage due to the unavailability of any data.  According to the defendants, Banq alleges

8    only "competitive harm," which is a purely economic harm not actionable under the CFAA.

9    Banq responds that the defendants caused loss to Banq because Banq had to expend resources to

10   investigate the defendants' unauthorized access and to prevent it from continuing.  It also

11   contends that the defendants caused damage to Banq because the defendants impaired the

12   availability of the data and computer systems to Banq.

13           A plaintiff must suffer "damage or loss" to bring a private CFAA action. 18 U.S.C.

14   § 1030(g).  Unlike section 1030(a)(2)(C), section 1030(a)(5)(C) requires both "damage and

15   loss." *See Moonlight Mountain Recovery, Inc. v. McCoy*, No. 1:24-CV-00012-BLW, 2024 WL

16   4027972, at *4 (D. Idaho Sept. 3, 2024).

17           Under the CFAA, "damage" means "any impairment to the integrity or availability of

18   data, a program, a system, or information." 18 U.S.C. § 1030(e)(8).  In contrast, "loss" more

19   broadly means "any reasonable cost to any victim, including the cost of responding to an offense,

20   conducting a damage assessment, and restoring the data, program, system, or information to its

21   condition prior to the offense, and any revenue lost, cost incurred, or other consequential

22   damages incurred because of interruption of service." 18 U.S.C. § 1030(e)(11).  In considering

23   which losses are compensable, the Ninth Circuit has explained that the CFAA "targets the

unauthorized procurement or alteration of information, not its misuse or misappropriation."
*Nosal*, 676 F.3d at 863 (simplified).  So under the CFAA, "it is not the costs related to the
*release* of the information that are recoverable, but the costs related to the *unauthorized access*."
*Moonlight Mountain Recovery*, 2024 WL 4027972, at *5.

 As for "loss" under the CFAA, the complaint alleges that the defendants' unauthorized
access "caused competitive harm to Banq" and "caused Banq to expend resources to investigate
the unauthorized access and to prevent such access from continuing." ECF No. 1 at 18.
Competitive harms are economic harms, and losses under the CFAA do not include "purely
economic harm unrelated to computer systems." *Moonlight Mountain Recovery*, 2024 WL
4027972, at *4 (quotation omitted).  But costs for investigating and preventing such access are
losses under the CFAA.  Banq alleges that it incurred these costs in responding to the alleged
unauthorized access, so these are compensable losses under the CFAA.

 As for "damage" under the CFAA, the complaint alleges that the defendants sold "all of
Banq's computers" to Fortress. ECF No. 1 at 10.  These computers "provided access to" and
"contained" Banq's corporate information. *Id.*  Construed in Banq's favor, this allegation
suggests that Banq lost access to the information stored on or made accessible by those
computers.  And the defendants allegedly sold "all of Banq's computers," which may hinder
Banq's access to its servers and corporate information. *Id.*  These facts plausibly allege that the
defendants compromised the availability of Banq's data, which is damage compensable under
the CFAA.

 In sum, Banq's complaint plausibly alleges that the defendants accessed Banq's cloud
servers without authorization, causing loss to Banq.  So the complaint states a claim under
section 1030(a)(2)(C).  The complaint also plausibly alleges that the defendants accessed

1  information on Banq's computers without authorization, causing both loss and damage to Banq.

2  So the complaint also states a claim under section 1030(a)(5)(C). Therefore, I deny the

3  defendants' motion to dismiss the CFAA and Nevada computer crime law claims.[3]

4  ## C.    *State-law Claims that Defendants Argue are Preempted*

5      The defendants argue that Banq's state-law claims for conversion, fraud, breach of

6  fiduciary duty, and unjust enrichment are preempted by Nevada's Uniform Trade Secrets Act

7  (NUTSA) because they merely "repurpose [Banq's] misappropriation claims." ECF No. 117 at

8  21. Additionally, they argue that each of these claims fails for independent reasons. Banq

9  responds that none of these claims is preempted and that there is no independent reason to

10  dismiss them.

11      NUTSA "displaces conflicting tort, restitutionary, and other law of this state providing

12  civil remedies for misappropriation of a trade secret." NRS § 600A.090(1). "A tort claim

13  conflicts with NUTSA if its proof depends on the defendant misappropriating a trade secret. In

14  other words, if a plaintiff must prove misappropriation of a trade secret to succeed on its tort

15  claim, that tort claim is barred." *Octaform Sys. Inc. v. Johnston*, No. 2:16-cv-02500-APG-VCF,

16  2017 WL 2562110, at *4 (D. Nev. June 12, 2017) (footnote omitted). Consequently, a plaintiff

17  cannot pursue a common law tort claim arising from a "single factual episode" of

18  misappropriation of a trade secret. *Frantz v. Johnson*, 999 P.2d 351, 357-58 (Nev. 2000).

19      However, NUTSA does not displace "all claims that arise from a factual circumstance

20  possibly involving a trade secret." *Id.* at 357 n.3. NUTSA does not displace "[o]ther civil

21  remedies that are not based upon misappropriation of a trade secret." NRS § 600A.090(2)(b).

22

23  _____

[3] The defendants did not provide any independent basis for dismissing the Nevada computer crime law claims.

1  Thus, if the plaintiff pleads claims that "do not depend on the information at issue being deemed

2  a trade secret," NUTSA does not displace those claims. *Frantz*, 999 P.2d at 357 n.3.

3                    *1.    Conversion*

4         The defendants argue that NUTSA preempts Banq's conversion claim.  They also argue

5  that the complaint does not plausibly allege that the defendants converted Banq's computer

6  equipment because, according to the complaint, Banq sold the equipment to Fortress.  And they

7  argue that the complaint alleges no facts to support the claim that the defendants converted seat

8  licenses for Las Vegas Raiders games.  Banq responds that its conversion claim is not preempted

9  because it alleges the theft of tangible property.  It argues that the conversion claim is otherwise

10  plausibly pleaded.

11         Conversion is "a distinct act of dominion wrongfully exerted over another's personal

12  property in denial of, or inconsistent with his title or rights therein or in derogation, exclusion, or

13  defiance of such title or rights." *M.C. Multi-Fam. Dev., L.L.C. v. Crestdale Assocs., Ltd.*, 193

14  P.3d 536, 542-43 (Nev. 2008) (simplified).  Intangible property can be converted. *See id.* at 543

15  (holding that a contractor's license can be converted).  "[C]onversion must be essentially

16  tortious, meaning it must be an unlawful act." *Blige v. Terry*, 540 P.3d 421, 431 (Nev. 2023) (en

17  banc) (simplified).  For instance, conversion may be committed by taking chattel from another

18  by fraud. *Id.*; *see also* Restatement (Second) of Torts § 221(b) (recognizing that conversion

19  includes intentionally "obtaining possession of a chattel from another by fraud or duress").

20         The complaint alleges conversion of Banq's trade secrets. ECF No. 1 at 19.  Banq does

21  not dispute that NUTSA preempts claims for conversion of trade secrets.  Conversion of trade

22  secrets is inseparable from misappropriation of those trade secrets (e.g., by wrongful

23

                                          16

1  acquisition). *See* NRS § 600A.030(2)(a).  So NUTSA preempts the claim for conversion of trade

2  secrets.

3        But the complaint also alleges conversion of Banq's computers, software, intellectual

4  property, and other "corporate assets" such as Banq's seat licenses for Las Vegas Raiders games.

5  ECF No. 1 at 19.  Conversion of these items does not require misappropriation of a trade secret,

6  so NUTSA does not preempt Banq's conversion claim for these items.  The complaint alleges

7  that the computers and software were acquired without authorization, which constitutes wrongful

8  dominion over them.  To the extent that Banq's intellectual property does not constitute a trade

9  secret, it may also be converted.  And the complaint alleges that Purcell specifically transferred

10  the Las Vegas Raiders' seat licenses to himself prior to his departure from Banq, ECF No. 1 at

11  12, which plausibly pleads conversion.  So these conversion claims remain.  I thus grant the

12  motion to dismiss only with respect to conversion of Banq's trade secrets.

13              *2.    Fraud-based claims*

14        The defendants argue that NUTSA preempts Banq's fraud claim against Purcell because

15  Banq can prove that Purcell made a false representation only if Banq proves that Purcell

16  misappropriated Banq's trade secrets.  Additionally, they argue that Purcell's alleged

17  misrepresentations are non-actionable puffery.  And they claim that Banq does not plead with

18  particularity under Rule 9(b) that Banq justifiably relied on Purcell's representation or that

19  Purcell intended to induce Banq to rely on his representation.  Banq responds that the fraud claim

20  is not preempted, that Purcell's misrepresentations were not puffery, and that the complaint

21  adequately alleges Banq's justifiable reliance and Purcell's intent to induce that reliance.

22        As an initial point, none of these fraud claims requires that Banq have any protectable

23  trade secrets because the complaint alleges that Purcell gained by using "Banq's resources,

technology, intellectual property, personnel, corporate opportunities, and corporate assets." ECF No. 1 at 20.  Purcell may have cheated Banq out of these items, even if Banq has no protectable trade secret.  So NUTSA does not preempt the fraudulent misrepresentation, inducement, and concealment claims.  The question then is whether those claims pass muster under Rule 9(b).

a. <u>Fraudulent Misrepresentation and Fraudulent Inducement</u>

Under Nevada law, a fraudulent misrepresentation claim consists of the following elements: (1) the defendant made a false representation; (2) the defendant knew or believed that its representation was false or that defendant had "an insufficient basis of information for making the representation;" (3) the defendant intended to induce the plaintiff "to act or refrain from acting upon the misrepresentation;" and (4) the plaintiff was damaged  "as a result of relying on the misrepresentation." *Barmettler v. Reno Air, Inc.*, 956 P.2d 1382, 1386 (Nev. 1998). Fraudulent inducement is fraudulent misrepresentation where the defendant specifically intends to induce the plaintiff "to consent to [a] contract's formation." *J.A. Jones Const. Co. v. Lehrer McGovern Bovis, Inc.*, 89 P.3d 1009, 1018 (Nev. 2004).

"[R]epresentations as to the reliability and performance" of a product may "constitute mere commendatory sales talk about the product ('puffing')" and thus "not [be] actionable in fraud." *Bulbman, Inc. v. Nevada Bell*, 825 P.2d 588, 592 (Nev. 1992).  In the corporate context, statements that are "transparently aspirational," "mere corporate puffery," or "other feel good monikers" are generally not actionable as fraud because "professional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives." *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 700 (9th Cir. 2021) (quotations omitted).  "Such statements rise to the level of materially misleading statements only if they provide concrete description of the past and present that affirmatively create a plausibly misleading impression of

18

1    a state of affairs that differed in a material way from the one that actually existed." *Id.*

2    (simplified).

3        According to the complaint, Purcell told the Banq board and shareholders during a June

4    27, 2021 "update" that Banq had a "rare opportunity" to be "the foundation for disruptive,

5    revolutionary technology that will utterly transform everything from healthcare to the stock

6    market, real estate, photo, film & music royalties, art, sports & concert tickets, DMV records,

7    and more." ECF No. 1 at 20. This statement promised to "pivot" Banq to NFT technology, even

8    though Purcell "intended to use Banq's pivot as a means to improperly use Banq's resources,

9    intellectual property, personnel, opportunities, and corporate assets for his own personal gain."

10    *Id.*

11        Purcell's claim that the NFT technology would be "disruptive" or "revolutionary" or

12    "transform everything" is puffery not actionable as fraud. At most, these statements imply that

13    Purcell would "pivot" Banq to NFT technology. Such a promise may indeed be fraudulent if

14    "the promisor had no intention to perform at the time the promise was made." *Bulbman, Inc*, 825

15    P.2d at 592. But the complaint does not allege that Purcell never intended to pivot Banq to NFT

16    technology. If anything, it alleges the opposite: under Purcell's leadership, Banq developed

17    valuable NFT technology in the weeks following the statement. *See* ECF No. 1 at 8. The

18    complaint instead alleges that after the pivot, Purcell intended to take the NFT technology. *See*

19    *id.* at 9 (alleging that in August and December 2021, Purcell formed the Planet NFT companies).

20    The complaint does not identify any representation Purcell made about what would happen to the

21    NFT technology after the pivot. So the complaint does not allege with particularity that Purcell's

22    statements were false when made. Consequently, the complaint does not allege that Banq took

23

any particular action because of a misrepresentation that caused the company damage.  Nor does it point to any contract that Banq entered in reliance on Purcell's statements.

Because the complaint does not indicate how Purcell's statements were false when made or what damaging actions Banq took due to Purcell's statements, the complaint does not allege fraudulent misrepresentation or inducement with the particularity required under Rule 9(b).  I therefore dismiss these claims but grant Banq leave to amend regarding them if Banq can plead non-puffery statements upon which it relied.

b.    Fraudulent Concealment

Banq also alleges that Purcell fraudulently concealed information that he had a duty to disclose to Banq. *Id.* at 20-21.  To state a fraudulent concealment claim, a plaintiff must plausibly allege:

> (1) the defendant concealed or suppressed a material fact; (2) the defendant was under a duty to disclose the fact to the plaintiff; (3) the defendant[] intentionally concealed or suppressed the fact with the intent to defraud the plaintiff; that is, the defendant[] concealed or suppressed the fact for the purpose of inducing the plaintiff to act differently than she would have if she had known the fact; (4) the plaintiff was unaware of the fact and would have acted differently if she had known of the concealed or suppressed fact; (5) and, as a result of the concealment or suppression of the fact, the plaintiff sustained damages.

*Leigh-Pink v. Rio Props., LLC*, 512 P.3d 322, 325-26 (Nev. 2022) (en banc) (quotation omitted). A duty to disclose arises if there is a "special relationship" where "one party imposes confidence in the other because of that person's position, and the other party knows of this confidence." *Mackintosh v. Jack Matthews & Co.*, 855 P.2d 549, 553 (Nev. 1993) (simplified).

Here, Purcell was an executive at Banq, so Banq and Purcell were in a relationship of confidence. *See W. Indus., Inc. v. Gen. Ins. Co.*, 533 P.2d 473, 476 (Nev. 1975) (recognizing that corporate officers have a fiduciary relationship with the corporation and thus owe a duty of

"good faith, honesty and full disclosure").  Based on the statements discussed above, Banq plausibly alleges that Purcell had a duty to disclose his true motives in executing the "pivot" when he made his June 27, 2021 update to the board and investors.  It also alleges that Banq's board would have acted differently had it known of that information.  So these allegations state a claim for fraudulent concealment.

I thus grant the defendants' motion to dismiss the fraudulent misrepresentation and inducement claims but deny their motion to dismiss the fraudulent concealment claim.

### 3.  *Breach of Fiduciary Duties*

The defendants argue that NUTSA preempts Banq's breach of fiduciary duty claims against the individual defendants and that the complaint fails to state with particularity the circumstances surrounding the breach of fiduciary duties under Rule 9(b).  Banq responds that the complaint specifically alleges several breaches of fiduciary duty that do not rely on trade secret misappropriation and that satisfy Rule 9(b).

"A claim for breach of fiduciary duty customarily has three elements: (1) existence of a fiduciary duty, (2) breach of the duty, and (3) damages as a result of the breach." *Guzman v. Johnson*, 483 P.3d 531, 538 (Nev. 2021) (en banc).  "In Nevada, directors and officers owe the fiduciary duties of care and loyalty to the corporation." *Chur v. Eighth Jud. Dist. Ct. in & for Cnty. of Clark*, 458 P.3d 336, 340 (Nev. 2020) (en banc).  Under NRS § 78.138(7), "to state a claim against [directors or officers] individually, the [plaintiff] must allege facts that when taken as true (1) rebut the business judgment rule, and (2) constitute a breach of a fiduciary duty involving intentional misconduct, fraud or a knowing violation of law." *Chur*, 458 P.3d at 341 (quotation omitted).

The complaint alleges that the individual defendants breached their fiduciary duties by "[u]sing Banq's trade secrets . . . without authorization" to "establish a competing venture and launch a nearly identical product." ECF No. 1 at 22. But this breach could occur only if the individual defendants misappropriated Banq's trade secrets, say by "us[ing]" them without Banq's consent even though they were under a "duty to maintain [the trade secret's] secrecy or limit its use." *See* NRS 600A.030(2)(c). So NUTSA preempts the breach of fiduciary claim in that respect.

However, the complaint also alleges that the individual defendants transferred Banq's proprietary information, computers, and Las Vegas Raiders seat licenses to themselves. ECF No. 1 at 22. The complaint details the "sham" sale of Banq's computers. *Id.* at 10. And the complaint alleges that the individual defendants used Banq's "proprietary software" for their competing venture, induced Banq employees to resign to work for Planet and Fortress, sold corporate assets to Fortress and Planet "without due consideration," and usurped Banq's business opportunities by wooing potential investors. *Id.* at 9-10, 22. Breaches of fiduciary duties as to these actions do not require misappropriation of a trade secret. These allegations plausibly state a claim for breach of the individual defendants' duty of loyalty to Banq. *See Guzman*, 483 P.3d at 537 ("[A] plaintiff may rebut the business judgment rule's presumption of good faith by, for instance, showing that the fiduciary had a personal interest in the transaction."). Even if Rule 9(b) applies to breach of fiduciary duty claims,[4] the complaint states the "who, what, when,

---

[4] The defendants suggest that all breach of fiduciary duty claims under Nevada law sound in fraud, citing *Miyayama v. Burke*, No. 2:20-CV-01683-DJA, 2022 WL 1665211, at *6 (D. Nev. May 25, 2022). The *Miyayama* court applied Rule 9(b) to a breach of fiduciary duty claim, reasoning that such claims are "analogous" to fraud under Nevada law. *Id.* at *6. The court relied on Nevada caselaw holding that "[a] breach of fiduciary duty is analogous to fraud, and thus, Nevada applies the three-year statute of limitation" for fraud claims to breach of fiduciary duty claims. *See In re Amerco Derivative Litig.*, 252 P.3d 681, 703 (Nev. 2011) (en banc). But

where, how" of the sham computer sale and the migration of Banq's corporate information and

opportunities to Fortress and Planet. I thus grant the motion to dismiss only with respect to

breach of fiduciary duty pertaining to Banq's trade secrets.

### 4. Unjust Enrichment

The defendants argue that NUTSA preempts Banq's unjust enrichment claim. They also

argue that according to the complaint, the defendants passively received a benefit from Banq, but

Banq did not bestow any benefit on the defendants. Banq responds that its unjust enrichment

claim does not depend on showing trade secret misappropriation. It also argues that Banq has

bestowed a benefit on the defendants because the defendants stole Banq's beneficial trade

secrets, corporate assets, and computer equipment and usurped Banq's corporate opportunities.

"Unjust enrichment exists when the plaintiff confers a benefit on the defendant, the

defendant appreciates such benefit, and there is acceptance and retention by the defendant of

such benefit under circumstances such that it would be inequitable for him to retain the benefit

without payment of the value thereof." *Certified Fire Prot. Inc. v. Precision Constr.*, 283 P.3d

250, 257 (Nev. 2012) (simplified).

The complaint alleges that the individual defendants derived a benefit from Banq's trade

secrets. ECF No. 1 at 24. Banq alleges that the defendants realized a benefit by "theft of" Banq's

trade secrets. ECF No. 1 at 2. Theft of a trade secret is inseparable from misappropriation by

---

this caselaw applying Nevada's limitations law does not support the broad proposition that every breach of fiduciary duty claim "sounds in fraud" under Rule 9(b). Nor is such a proposition obvious, because fiduciary duty claims encompass breaches of the duty of care, which generally has little to do with fraud. And "[w]hile a federal court will examine state law to determine whether the elements of fraud have been pleaded sufficiently to state a cause of action, the Rule 9(b) requirement that the circumstances of the fraud must be stated with particularity is a federally imposed rule." *Vess*, 317 F.3d at 1103 (quotation and emphasis omitted). So state court pronouncements are not dispositive regarding whether a state law claim is grounded in fraud for Rule 9(b) purposes.

acquiring the trade secret by improper means or using it without Banq's consent. *See* NRS

§ 600A.030(2)(a), (c)(2)(III).  So NUTSA preempts the unjust enrichment claim in that respect.

*See Hutchison v. KFC Corp.*, 809 F. Supp. 68, 71 (D. Nev. 1992).  However, the complaint also

alleges that the individual defendants derived a benefit by taking Banq's corporate assets,

computer equipment, and corporate opportunities. *Id.* at 9-10, 24.  Unjust enrichment as to these

items does not require misappropriation of a trade secret.  So NUTSA does not preempt the

unjust enrichment claim as to these items.

      To support their argument that Banq conferred no direct benefit on the defendants, the

defendants rely on cases where a plaintiff conferred a benefit on a third party, who in turn

transferred that benefit to the defendant. *See WMCV Phase 3, LLC v. Shushok & McCoy, Inc.*,

750 F. Supp. 2d 1180, 1197 (D. Nev. 2010) (dismissing unjust enrichment claim against

defendants where the complaint alleged only that those defendants received a benefit from their

co-defendants, not from the plaintiff directly); *Chemeon Surface Tech., LLC v. Metalast Int'l,

Inc.*, 312 F. Supp. 3d 944, 956 (D. Nev. 2018) (dismissing unjust enrichment claim, where

complaint alleged that a non-party employee "improperly acquired the specimens from [the

plaintiff's] database and then gave those specimens to" the defendants).  But under Nevada law,

unjust enrichment does not require that a benefit be "direct." *See Topaz Mut. Co. v. Marsh*, 839

P.2d 606, 613 (Nev. 1992) (holding unjust enrichment claim was viable if plaintiffs "at least

indirectly benefited" the defendants).  And in any event, those cases are inapposite here because

Banq allegedly conferred a benefit directly on the defendants, not via a third party.  For instance,

the complaint alleges that the defendants arranged the sale of Banq's computers directly to

Fortress. ECF No. 1 at 10.  I thus grant the motion to dismiss only with respect to unjust

enrichment pertaining to Banq's trade secrets.

### D.    *Aiding and Abetting Breach of Fiduciary Duties*

The defendants argue that Banq's aiding and abetting breach of fiduciary duties claim against Fortress and Planet should be dismissed for two independent reasons.[5]  First, they contend that Banq fails to distinguish what Fortress and Planet did in aiding the individual defendants from what the individual defendants did themselves.  Second, they argue that Banq does not allege specific conduct by Fortress or Planet that substantially assisted the individual defendants with breaching their fiduciary duties.  According to the defendants, the complaint alleges that Fortress and Planet passively benefitted from the individual defendants' conduct, not that Fortress and Planet actively assisted them.  Banq responds that Fortress and Planet aided the individual defendants because their breach of fiduciary duty was "only accomplished because of the alleged assistance of" Fortress and Planet, which served as "repositories" of the improperly acquired information and assets. ECF No. 118 at 28-29.

"Aiding and abetting the breach of a fiduciary duty has four required elements: (1) there must be a fiduciary relationship between two parties, (2) that the fiduciary breached, (3) the defendant third party knowingly and substantially participated in or encouraged that breach, and (4) the plaintiff suffered damage as a result of the breach." *Guilfoyle v. Olde Monmouth Stock Transfer Co.*, 335 P.3d 190, 198 (Nev. 2014) (en banc).

The complaint alleges that Fortress and Planet knowingly participated in the individual defendants' breach of their fiduciary duties by "hiring key employees from Banq at the direction of the Defendant Individuals and receiving corporate assets and proprietary information stolen

---

[5] The defendants also argue that this claim fails because the breach of fiduciary duty claim fails. Because I do not entirely dismiss the breach of fiduciary duty claim, I consider the defendants' independent arguments for dismissal.  However, to the extent this claim is meant to include aiding and abetting a breach of fiduciary duty related to misappropriation of trade secrets, I dismiss that portion of it as preempted by NUTSA.

1    from Banq." ECF No. 1 at 23.  The complaint alleges facts supporting these allegations and

2    describes who allegedly founded Fortress and Planet, when they were founded, and what and

3    when they received various assets and personnel from Banq. *See id.* at 9-10, 12.  These

4    allegations thus describe how Fortress and Planet assisted with the individual defendants' breach

5    of their fiduciary duties. *Cf. Bagley v. Beville*, No. 2:13-CV-01119-JCM-CWH, 2014 WL 28999,

6    at *3 (D. Nev. Jan. 2, 2014) (dismissing aiding and abetting breach of fiduciary duty claim,

7    where the claim rested "entirely upon a conclusory statement that the defendants other than [the

8    breaching co-defendant] aided him in breaching his fiduciary duty to the corporation" and did

9    not "present any details regarding what specific acts performed by the defendants constituted

10   aiding and abetting").  So the complaint plausibly pleads conduct constituting aiding and abetting

11   that is separate from the individual defendants' conduct.

12          The defendants argue that knowingly receiving corporate assets obtained by a breach of

13   fiduciary duty does not constitute knowing and substantial participation in that breach, and they

14   rely on *Synthes, Inc. v. Emerge Med., Inc.*, in support. 25 F. Supp. 3d 617 (E.D. Pa. 2014).  The

15   *Synthes* court found that a defendant corporation did not substantially assist a breach of fiduciary

16   duty because the defendant corporation was "nothing more than a passive beneficiary" that

17   "provided no funding, no additional means for [the individual defendant] to carry out his acts,

18   and no other encouragement." *Id.* at 677-78.  As that court reasoned, "[i]n practice, liability for

19   aiding and abetting often turns on how much encouragement or assistance is substantial enough."

20   *Id.* at 678; *see also* Restatement (Second) of Torts § 876, cmt. d (1979) ("The assistance of or

21   participation by the defendant may be so slight that he is not liable for the act of the other.  In

22   determining this, the nature of the act encouraged, the amount of assistance given by the

23

26

1  defendant, his presence or absence at the time of the tort, his relation to the other and his state of

2  mind are all considered.").

3        Here, knowingly serving as a "repository" necessary for a breach of fiduciary duty

4  plausibly alleges substantial participation in that breach.  For instance, a business entity may aid

5  and abet an individual defendant's breach of fiduciary duty if the entity knowingly receives

6  confidential information from an individual defendant and takes no "meaningful steps to ensure"

7  that the entity "did not receive" that information. *Beard Rsch., Inc. v. Kates*, 8 A.3d 573, 604

8  (Del. Ch.), *aff'd sub nom. ASDI, Inc. v. Beard Rsch., Inc.*, 11 A.3d 749 (Del. 2010); *see also In*

9  *re First All. Mortg. Co.*, 471 F.3d 977, 995 (9th Cir. 2006) (upholding a jury's finding that a

10  bank substantially assisted a customer's fraud, reasoning that "'ordinary business transactions' a

11  bank performs for a customer can satisfy the substantial assistance element of an aiding and

12  abetting claim if the bank actually knew those transactions were assisting the customer in

13  committing a specific tort.  Knowledge is the crucial element.").  I predict that the Supreme

14  Court of Nevada would follow this approach.[6]  Whether the extent of Fortress and Planet's

15  knowledge and conduct, including whether they knowingly served as repositories for corporate

16  assets, is sufficiently substantial is a factual question better addressed (at earliest) at the summary

17  judgment stage, as it was in *Synthes*.  I thus deny the defendants' motion to dismiss Banq's claim

18  for aiding and abetting breach of fiduciary duties.

19  / / / /

20  / / / /

21

22  _____

23  [6] "When the highest court of a state has not directly spoken on a matter of state law, a federal court sitting in diversity must generally use its own best judgment in predicting how the state's highest court would decide the case." *T-Mobile USA Inc. v. Selective Ins. Co. of Am.*, 908 F.3d 581, 586 (9th Cir. 2018) (quotation omitted).

1            ### E.    *Interference with Prospective Economic Advantage*

2            The defendants move to dismiss Banq's interference with prospective economic

3    advantage claim against Purcell, arguing that Banq does not allege any prospective contractual

4    relationship with which Purcell interfered or intended to interfere.  Banq responds that the

5    complaint alleges specific instances in which Purcell interfered with Banq's business

6    relationships with investors, shareholders, and potential investors.

7            Interference with prospective economic advantage has five elements:

8                    (1) a prospective contractual relationship between the plaintiff and a third party;
                    (2) knowledge by the defendant of the prospective relationship;
9                    (3) intent to harm the plaintiff by preventing the relationship;
                    (4) the absence of privilege or justification by the defendant; and
10                   (5) actual harm to the plaintiff as a result of the defendant's conduct.

11    *In re Amerco Derivative Litig.*, 252 P.3d 681, 702 (Nev. 2011) (en banc).

12            The complaint alleges that a few weeks prior to Purcell's departure from Banq, he "wrote

13    a select group of Banq shareholders" and "communicated with specifically identifiable potential

14    investors." ECF No. 1 at 21.  He allegedly said that Planet would be "a ridiculously easy way to

15    publish (mint) [NFTs] on Polygon and Solona, as well as sell them directly or on a marketplace

16    like Ethernity, Autograph, OpenSea, etc." *Id.*  And Purcell allegedly solicited Banq's

17    shareholders, investors, and prospective investors to invest in Fortress and Planet who, in turn,

18    did not make investments in Banq, causing harm to Banq. *Id.* at 22.

19            The defendants argue that the complaint merely alleges interference with existing

20    shareholders and investors, not a "prospective" interference.  But the defendants overlook that

21    one can interfere with prospective investments made by current investors.  What matters is

22    whether the business relationship (the investment) is current or prospective, not whether the

23    investor is current or prospective. *Cf. Klein v. Freedom Strategic Partners, LLC*, 595 F. Supp. 2d

1152, 1163 (D. Nev. 2009) (dismissing interference with prospective economic advantage claim

because the complaint alleged only "current relationships, not prospective ones").  And the

complaint alleges that the solicited Banq shareholders did not invest in Banq due to Purcell's

interference. ECF No. 1 at 22.

 Moreover, the alleged potential investors are not merely unknown "hypothetical"

investors but specific persons who received a specific communication from Purcell. *Cf. EVIG,*

*LLC v. Natures Nutra Co.*, 685 F. Supp. 3d 991, 997-98 (D. Nev. 2023) (dismissing interference

with prospective economic advantage claim because the complaint's "allegations simply assume

that defendant must have known that plaintiff had relationships with 'consumers' generally" and

the plaintiff conceded that it "does not currently know of any specific customers").  And viewing

the facts alleged in the complaint as a whole, one can reasonably infer that Purcell intended to

harm Banq by engaging in "direct and intentional acts designed to disrupt and interfere with

Banq's business relationships." ECF No. 1 at 21.  I thus deny the defendants' motion to dismiss

Banq's claim for interference with prospective economic advantage.

### F. *Negligence for Spoliation of Evidence*

 The defendants move to dismiss Banq's negligent spoliation of evidence claim.  They

argue that Banq failed to plead facts underlying any spoliation and failed to allege that the

individual defendants had a duty to preserve any evidence.  Banq responds that the defendants

had a duty to preserve Banq's records and relevant evidence because Banq's chairman instructed

the individual defendants to do so and because the individual defendants owed fiduciary duties to

Banq.

 Nevada does not recognize an independent tort for spoliation of evidence. *Timber Tech*

*Engineered Blds. Prods. v. The Home Ins. Co.*, 55 P.3d 952, 954 (Nev. 2002) (relying on

1  California law).  But the Supreme Court of Nevada's decision in *Timber Tech* appears to

2  acknowledge that there could be circumstances to support a negligence claim based on spoliation

3  where the defendant "owed a duty to [the plaintiff] to preserve" the spoliated evidence. *Id.*

4  Though the Supreme Court of Nevada has not addressed this issue since *Timber Tech*, some

5  California courts have recognized a cause of action for negligence based on spoliation of

6  evidence "where the alleged tortfeasor expressly promised to preserve evidence." *Contreras v.*

7  *Am. Fam. Mut. Ins. Co.*, No. 2:12-CV-00249-MMD-VCF, 2013 WL 275265, at *2 (D. Nev. Jan.

8  24, 2013) (citing *Cooper v. State Farm Mut. Auto. Ins. Co.*, 177 Cal. App. 4th 876, 892 (Cal. Ct.

9  App. 2009)).  According to this caselaw, while there is no "general tort duty to preserve

10 evidence," negligent spoliation of evidence functions like "a contract principle of promissory

11 estoppel or a tort theory of voluntary assumption of a duty" to maintain evidence. *Cooper*, 177

12 Cal. App. 4th at 892, 894.[7]

13      The defendants do not argue that a Nevada court would reject a negligence claim based

14 on "voluntary assumption" of a duty to preserve evidence.  Therefore, I will assume for the sake

15 of argument that the Supreme Court of Nevada would recognize such a negligence-based cause

16 of action for spoliation of evidence.

17      The complaint alleges that John Jiles, Banq's chairman, wrote to Purcell and Georgiades,

18 notifying them that "as officers of Banq" they had an obligation to "ensure that nothing is done

19

---

20 [7] *See also Cooper*, 177 Cal. App. 4th at 896 (recognizing a cause of action for negligent
   spoliation of evidence, and finding that the plaintiff stated a prima facie claim for negligent
21 spoliation of evidence where the defendant had a duty to preserve evidence based on "evidence
   of a promise made by [defendant] to preserve [evidence] and reliance thereon by plaintiff");
22 *Rosen v. St. Joseph Hosp. of Orange Cnty.*, 193 Cal. App. 4th 453, 459-61 (Cal. Ct. App. 2011)
   (recognizing a cause of action for negligent spoliation of evidence under a voluntary assumption
23 of duty theory and reconciling California caselaw, noting that it is "settled law" that "one who,
   having no initial duty to do so, undertakes to come to the aid of another . . . has a duty to exercise
   due care in performance" (simplified)).

to harm the going-concern value of Banq." ECF No. 1 at 24.  Jiles asked Purcell and Georgiades to "preserve all records and documentation and ensure Banq's technology is secure," "not take any actions to spend or transfer Banq capital other than in the ordinary course of business," and preserve the "integrity" of Banq's business. *Id.*  The complaint alleges that the individual defendants owed a "duty of care to Banq to preserve evidence." *Id.*  But the complaint does not allege that they promised to preserve evidence in response to Jiles' request.  So the complaint does not allege that they voluntarily assumed a duty to preserve the evidence.

Banq argues that the individual defendants nevertheless had a duty to preserve evidence for two reasons.  First, Banq argues that they had a duty to preserve evidence once litigation "became foreseeable." ECF No. 118 at 30.  Banq cites no authority supporting this broad duty. In the case Banq relies on, Judge Boulware held that the defendants had a duty to the plaintiffs to preserve evidence because the defendants "took actions indicative of an intention to comply with" the plaintiff's request to preserve relevant evidence and "agreed to take reasonable steps to preserve" that evidence. *Contreras v. Am. Fam. Mut. Ins. Co.*, 135 F. Supp. 3d 1208, 1220 (D. Nev. 2015).  The duty there was thus grounded in the defendant's voluntary assumption of a duty, not in the foreseeability of litigation.  So mere foreseeability of litigation does not give rise to a duty to preserve evidence, the breach of which would be actionable in tort.[8]

Second, Banq argues that the individual defendants had a duty to preserve evidence via their fiduciary duties to Banq. ECF No. 118 at 30.  Banq cites no authority for this proposition. And to the extent that the Supreme Court of Nevada would look to California caselaw for

---

[8] Of course, regardless of whether such a tort exists, intentional failure to preserve evidence when litigation is foreseeable may subject a party to sanctions under both state and federal law. *See generally* Fed. R. Civ. P. 37(e); *Fire Ins. Exch. v. Zenith Radio Corp.*, 747 P.2d 911, 913 (Nev. 1987).

1  guidance, that caselaw undermines Banq's position. *See Rosen v. St. Joseph Hosp. of Orange*

2  *Cnty.*, 193 Cal. App. 4th 453, 463 (Cal. Ct. App. 2011) ("[G]eneral, preexisting relationships are

3  not sufficient to support a spoliation of evidence claim.").  So even if I recognized a negligence-

4  based spoliation cause of action, I would decline to expand liability for negligent spoliation of

5  evidence under Nevada law because there is no indication that the Supreme Court of Nevada

6  would adopt it.

7  Accordingly, I dismiss Banq's claim for negligent spoliation of evidence.[9]

8  **III.    CONCLUSION**

9  I THEREFORE ORDER that the defendants' motion **(ECF No. 117) is GRANTED IN**

10  **PART.**  Accordingly:

11  - Banq's conversion, breach of fiduciary duty, and unjust enrichment claims are

12  dismissed to the extent that they are preempted by the Nevada Uniform Trade Secrets

13  Act.  Those claims remain pending in all other respects.

14  - Banq's fraudulent misrepresentation and fraudulent inducement claims are dismissed.

15  I grant Banq leave to amend regarding these claims to the extent it can plead non-

16  puffery statements upon which it relied.  Banq's fraudulent concealment claim

17  remains pending.

18  - Banq's negligent spoliation of evidence claim is dismissed.

19  / / / /

20  / / / /

21  / / / /

22

23  [9] As a separate matter, I would dismiss the negligent spoliation claim against Lehtiniitty for the additional reason that he is not named in any of the factual allegations underlying the negligent spoliation claim.

1  The defendants' motion is denied in all other respects.  Banq may file an amended complaint no

2  later than August 28, 2025.

3          DATED this 29th day of July, 2025.

4          _____
           ANDREW P. GORDON
5          CHIEF UNITED STATES DISTRICT JUDGE

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23